# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION
## AT LEXINGTON

CYNTHIA THORPE, as NEXT FRIEND
and On behalf of D.T., a minor child,

      Plaintiff,

V.

BREATHITT COUNTY BOARD OF
EDUCATION, et al.,

      Defendants.

CIVIL ACTION NO. 5:11-CV-294-KKC

<u>OPINION AND ORDER</u>

*** *** ***

This matter is before the Court on a motion for summary judgment brought by defendants Breathitt County Board of Education, Arch Turner, and Reggie Hamilton. (DE 64). The Court will grant the motion in part and deny the motion in part.

## I. BACKGROUND

In 2010 and 2011, D.T., a female minor, was a student at Sebastian Middle School in Breathitt County, Kentucky. (DE 1, p.7). There, D.T. was defendant Charles Mitchell's former student. (DE 1, p.7). Plaintiff Thorpe, on behalf of her minor child D.T., alleges that beginning in late 2010 and continuing into 2011, Mitchell made sexual advances toward D.T., "including but not limited to grossly inappropriate touchings, flirtations, email transmittal of pornographic material depicting his genitalia and constant text messaging inducing her to engage in sexual intercourse." (DE 1, p.7). Thorpe alleges that "[m]any of the sexual advances occurred during school hours in school buildings and classrooms or during school functions outside the school building." (DE 1, p.7). It is also alleged that the relationship eventually led to D.T. and Mitchell engaging in sexual intercourse in Mitchell's classroom. (DE 69, p.20). It is undisputed that

D.T.'s relationship with Mitchell ended when D.T's friend accessed her Facebook account and showed another teacher sexually explicit exchanges between D.T. and Mitchell. On May 9, 2011, the same day that the explicit Facebook exchanges were discovered, Mitchell met with Superintendent of Breathitt County Schools, Arch Turner, the school district's technology coordinator, Phillip Watts, and Assistant Superintendent David Napier. (DE 62, p.187). Mitchell testified that Turner was extremely angry and stated that Mitchell had "done this again." (DE 62, p.188). Turner gave Mitchell the option of resigning or facing immediate termination. (DE 62, p.188). Mitchell resigned.

Thorpe alleges that prior to Mitchell's abuse of D.T., both the principal of Sebastian Middle, Reggie Hamilton, and Superintendent Turner, knew that Mitchell had sexually harassed other Sebastian Middle School female students. (DE 1, p.7). For example, in May 2010, Mitchell exchanged telephone texts with another female student at Sebastian Middle. (DE 62, p.33–34). When the child's parents discovered the text exchange, they met with Principal Hamilton to discuss the incident. (DE 68, p.8). Ritchie reported to Turner that Mitchell had texted A.R. 168 times in the course of less than eight hours, and messages were exchanged "up until 5:00 o'clock in the morning . . . [on] either a Friday night or Saturday night." (DE 68, p.6). Ritchie reported that A.R. was "creeped out" by the exchange even though A.R. claimed that Mitchell "never said anything out of the way." (DE 68, p.6). No one has ever seen the content of the text messages between A.R. and Mitchell, but A.R.'s parents later had a printout from the wireless company of the times and number of text messages exchanged between Mitchell and A.R. (DE 68, p.7). Ritchie recalls that Principal Hamilton responded to the A.R. texting incident by saying, "That's sick," and "You know what that pervert's got on his mind."

A short time later, on May 17, 2010, A.R.'s parents, Superintendent Arch Turner and Assistant Superintendent, David Napier, held a meeting in Turner's office. (DE 68, p.8, DE 70-1). Turner's secretary, Stacy McKnight, took notes at the meeting. (DE 60, p. 11; DE 70-1). The notes confirm that A.R. and Mitchell exchanged 168 text messages in a short period of time during "all hours of the night." (DE 70-1). McKnight's notes also indicate that Mitchell told A.R. that A.R.'s friend should break up with her boyfriend because she is "too pretty and too good of a girl for him." (DE 70-1). The notes also state that another female student texted A.R. for Mitchell to tell A.R. that Mitchell was upset about A.R. talking about him. (DE 60, p. 14). McKnight's notes further indicate that, "he [Mitchell] has texted T., B., E., and T.," other eighth grade girls. (DE 60, p. 14). According to Ritche, Superintendent Turner also expressed concerns about the A.R. incident, saying things to the effect of, "He's [Mitchell] sick – he's a sick pervert. You know what he's got on his mind. I'll make sure, Rick, I'll take care of this. I'll put a stop to this right now." (DE 68, p.11). Ritchie responded by telling Turner that Mitchell was "going to end up raping somebody, if he ain't already done it." (DE 68, p.11). According to Ritchie, when Ritchie followed up with Turner a week or two later, Turner explained Mitchell's punishment and hurried Ritchie out of his office. (E 68, p.16).

In response to the allegations made by A.R.'s parents, Principal Hamilton and Superintendent Turner decided to suspend Mitchell for ten days without pay and put him on an unspecified 'improvement plan." (DE 70-2). In response to the A.R. incident, Mitchell drafted a letter denying any wrongdoing and noted, "I have done nothing wrong and would never dream of doing anything like they are suggesting." (DE 57-2). Although not written in the formal discipline letter, Hamilton and Turner repeatedly asked for a transcript of the text message exchange between Mitchell and A.R. (DE 57, p. 69). Mitchell was noncompliant with

Hamilton's multiple requests to provide text transcripts of his conversations with A.R. (DE 57, p. 69). Hamilton admits that he never followed up to see if Mitchell had stopped texting students. (DE 57, p.68).

D.T.'s mother, Cynthia Thorpe, initiated the complaint on D.T.'s behalf on September 13, 2011, asserting various claims against the Board, Turner, Hamilton, and Mitchell. (DE 1). On March 22, 2013, the Court dismissed the official-capacity Section 1983 claims against Mitchell, Turner and Hamilton; the official capacity state law claims against Mitchell, Turner and Hamilton; and the state law claims against the Board. (DE 45). Now, the Board, Turner, and Hamilton move to dismiss Thorpe's Section 1983 claim against the Board, her Section 1983 claim against Turner and Hamilton individually, her Title IX claim against the Board, and her state law claims against Turner and Hamilton. The Court will address each claim in turn.

## II. ANALYSIS

### A. Legal Standard

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving parties, here the Board, Turner, and Hamilton, bear the initial burden and must identify "those portions of the pleadings, depositions . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 322–25. Once the movant meets the initial burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## B. Section 1983 Claim Against the Board

In Count II of her complaint, Thorpe asserts that the Board violated D.T's Fourteenth Amendment right to be free from sexual abuse at the hands of public school employees. (DE 1). She asserts this claim under 42 U.S.C. §1983. (DE 1). "A municipal liability claim against . . . the School Board must be examined by applying a two pronged inquiry: (1) Whether the plaintiff has asserted the deprivation of a constitutional right at all; and (2) Whether the County and/or the School Board is responsible for that violation." *Doe v. Claibourne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996). D.T. is correct that she enjoys a constitutional right to be free from sexual abuse at the hands of public school employees, and she has properly asserted facts to support the deprivation of that right. *See id.* However, because the theory of respondeat superior is unavailable in Section 1983 claims, Thorpe has failed to establish that the *Board* violated D.T.'s constitutional right. *See id.* Under *Monell*, the Board cannot be found liable unless Thorpe "can establish that an *officially executed policy*, or the *toleration of a custom* within the school district leads to, causes, or results in the deprivation of a constitutionally protected right." *Id.* (emphasis

5

added) (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)).   Thorpe's Section

1983 claim against the Board asserts that the Board had an "unconstitutional custom" through

failure to investigate, failure to supervise, failure to maintain adequate policies, failure to follow

policies, and by manifesting an indifference towards sexual abuse.   (DE 1).   Essentially,

Thorpe's claim focuses on the Board's failure to act.   To state a claim against the Board under an

"inaction" theory, Thorpe must establish:

> (1) the existence of a *clear and persistent pattern* of sexual abuse
> by school employees;
> (2) *notice or constructive notice* on the part of the *School Board*;
> (3) the School Board's tacit approval of the unconstitutional
> conduct, such that their deliberate indifference in their failure to
> *act can be said to amount to an official policy of inaction*; and
> (4) that the School Board's custom was the "moving force" or
> direct causal link in the constitutional deprivation.

*Claiborne Cnty*, 103 F.3d at 508 (emphasis added); *see also Doe v. Farmer*, No. 3:06–0202,

2009 WL 3768906 (M.D. Tenn. Nov. 9, 2009).

Here, the evidence that Thorpe advances "does not show that the School Board, as an

official policymaking body, had a 'custom' that reflected a deliberate, intentional indifference to

the sexual abuse of its students."   *Id.*   In other words, Thorpe has failed to show that the "Board

*itself* is the wrongdoer."   *Id.* at 507.   A "custom," for purposes of Board liability, "must be so

permanent and well settled as to constitute a custom or usage with the force of law."   *Farmer*,

2009 WL 3768906 at *11.   Thorpe has not put forth any evidence to show that the Board itself

was on notice of Mitchell's misconduct.   Thorpe argues, "The Board was on 'constructive notice

of this pattern of misconduct.'"   (DE 70, p. 12) (citing *Claiborne Cnty*, 103 F.3d at 505–06).

Constructive notice at least means that circumstances were such that the Board should have

known about sexual abuse by Mitchell.   *See e.g. Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S.

274, 279 (1989) (noting that to be liable on the basis of constructive notice, there must be a finding that a school official should have known about a particular incident). However, Thorpe does not point to anywhere in the record that would indicate that *any* Board member was aware of the A.R. texting incident, or why the Board as a policymaking body *should have known* about the A.R. incident. The Board clearly had a policy against harassment, which states: "Harassment/Discrimination is prohibited at all times on school property . . . Employees who engage in harassment/discrimination . . . of a student . . . shall be subject to disciplinary action including, but not limited to, termination of employment." (DE 64-4). The Board has met its initial burden of pointing to a lack of evidence and the existence of an anti-harassment policy, and Thorpe has failed to go beyond the pleadings and provide any facts to show why the Board would have any type of notice of any instance of sexual abuse and a failure to act on that knowledge that would constitute a custom for purposes of Section 1983 liability.

Next, to the extent Thorpe suggests in her complaint that Turner or Hamilton are policymakers for purposes of implementing the Board's policies and customs, she points to no facts or law to support such claims. "Whether an official has final policymaking authority is a matter of state law." *Farmer*, 2009 WL 3768906 at *12. "The Sixth Circuit has found that an official is a policymaker if the official's actions are "(1) final, (2) not reviewable, and (3) unconstrained by the existing policies and practices of his supervisor[s], or where the official has been delegated unfettered discretion." *Id.* (citing *Moistere v. City of Memphis*, 115 Fed. Appx. 845, 853 (6th Cir. 2004)). Under Kentucky law, "Each board shall make and adopt . . . rules, regulations, and bylaws . . . for the management of the schools . . . for the qualification and duties of employees and the conduct of pupils." Ky. Rev. Stat. § 160.290. Thus, under Kentucky

law, school boards have general policymaking authority with regard to the duties of its employees and the general management of the schools.

Thorpe has not suggested that Hamilton, as a principal, has Board policymaking authority under Kentucky law or by delegation of authority from the Board. Moreover, it is clear that "courts often find that principals lack the authority to expose school districts to § 1983 liability." *See Farmer,* 2009 WL 3768906 at *12 (providing a number of cases that reject school district liability when the basis for the claim is principal action or inaction). Thorpe has provided nothing to suggest that Principal Hamilton could do anything to establish or alter the Board's policy on harassment. She has provided no factual evidence that Hamilton's decisions were that of a policymaker under Sixth Circuit guidelines. That is, nothing indicates that Hamilton's decisions were final, nonreviewable, or unconstrained by the existing sexual harassment policy. *Id.* Again, for purposes of Section 1983 claims against a municipal entity such as the Board, there is no respondeat superior. *Monell*, 436 U.S. at 690–91. Thus, even if Hamilton failed to follow Board policy, the Board is not liable for Hamilton's inaction, unless that inaction amounted to a policy. Because Thorpe provides no support for her claim that Hamilton is a "policymaker," his actions do not constitute Board action for purposes of Section 1983 liability.

Next, to the extent Thorpe argues that Superintendent Turner had policymaking authority for purposes of Board Section 1983 liability, Thorpe has again provided no law or facts to suggest that Turner had such authority *under these circumstances*. While a superintendent's actions, under certain circumstances, may expose a school district to Section 1983 liability, Thorpe has simply not provided authority for this Court to find Board liability based solely on Turner's actions in this matter. *See Wilson v. Luttrell*, Nos. 99-5459, 99-5460, 99-5461, 99-5462, 2000 WL 1359624 (6th Cir. Sept. 13, 2000). Thorpe has not cited a single Kentucky case

or statute delegating policymaking authority to Turner, nor has Thorpe argued that the Board gave Turner such authority. Moreover, Turner testified, "The Board sets the policies and the procedures, and I carry them out." (DE 63, p. 13). There is no evidence presented of any Board member, teacher, or parent that would suggest that Superintendent Turner, and not the Board, could set policies on his own, either officially or by a custom of practice.

Even if Superintendent Turner did have some policymaking authority and even taking all of Thorpe's allegations as true, Superintendent Turner knew, at most, of one incident of potential harassment or abuse, by one teacher, Mitchell, with one student, A.R. As another court in the Sixth Circuit noted in a very similar case, "the plaintiff does not present evidence that Hill [the principal] or CMCSS [the school Board] generally ignored sexual abuse, that they ignored abuse by other teachers, or that they ignored a long pattern of abuse by Farmer [the teacher abusing the plaintiff]." *Farmer*, 2009 WL 3768906 at *13. Similarly, even assuming Turner consciously disregarded the A.R. incident, Thorpe does not present any evidence to show that Turner ignored sexual abuse generally, or abuse by other teachers, or even multiple instances of abuse by Mitchell that would rise to the level of a "custom or policy." While the facts of this case are extraordinarily disturbing, the mere fact that Mitchell did sexually abuse more than one student does not, by virtue of it happening, put Turner or the Board on notice sufficient to constitute a policy for purposes of Section 1983 liability, particularly when Turner knew of only one potential instance of abuse in the past. "There is an analytical distinction between being deliberately indifferent as to one particular incident, and having a 'policy' of always being deliberately indifferent to unconstitutional actions. A municipality could be found to have a policy of failing to act in the face of *repeated constitutional violations*." *Claiborne Cnty*, 103 F.3d at 508–09 (emphasis added).

Instead of providing support for its policymaking theories, Thorpe relies on *Doe ex rel.*
*Doe v. Warren Consolidated Sch.*, 307 F. Supp. 2d 860, 887 (E.D. Mich. 2003). In that case, the
court denied summary judgment because instances of misconduct by a teacher had continued for
fourteen years and because the "Board of Education delegated responsibility over personnel
matters involving teachers, no matter how serious, to the superintendent and his administrative
staff." *Id.* at 887. The district had even negotiated a deal with one victim of abuse, in which she
would not to file sexual harassment charges in exchange for keeping her job. *Id.* at 888.
Moreover, the district also had a policy of removing letters of reprimand at the request of the
teacher after three years, as long as no similar instances of discipline had occurred, and no
exception existed for instances involving serious moral turpitude. *Id.* Thus, in that case, the
court held that "the District clearly was on constructive notice of this pattern of misconduct." *Id.*
at 887. The facts in the present case are hardly comparable. Thorpe has not alleged that the
Board handed over all matters concerning teachers to the Superintendent, no matter how serious.
Thorpe has not alleged that the Board or anyone else hid records of repeated abuse by Mitchell.
Thorpe has not alleged that the Board or Turner made deals to keep victims quiet. Thorpe has
not even alleged that the Board or Turner *knew* of repeated abuse by Mitchell. Thus, Thorpe's
reliance on *Warren Consolidated Schools* is misplaced, as the relevant facts concerning
superintendent and board notice are markedly different.

Finally, Thorpe makes a one-line argument that, "A systematic failure to supervise or
train state employees can amount to a policy or custom of 'deliberate indifference to
constitutional violations that creates municipal liability under § 1983." (DE 70, p. 11). First, it
is unclear whether Thorpe means that the Board failed to train Mitchell, the abuser in this case,
or Turner and Hamilton. However, this claim fails under either theory of recovery.

> A systematic failure to train employees amounts to a custom or policy for which the employer may be subject to § 1983 liability only if such failure amounts to deliberate indifference to the rights of persons with whom the employees come into contact. To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [employer] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.

*Savoie v. Martin*, 673 F.3d 488, 495 (6th Cir. 2012) (internal citations omitted). This claim fails, because, as previously mentioned, Thorpe has not provided a single fact to indicate that the *Board* knew or should have known about any instances of unconstitutional conduct and ignored a history of abuse, or that training in this particular area was deficient. Again, "[t]he standard of 'deliberate indifference' is a stringent one and requires proof that the defendants 'disregarded a known or obvious consequence' of their actions." *Sagan v. Sumner Cnty. Bd of Educ.*, 726 F. Supp. 2d 868, 886 (M.D. Tenn. 2010). Thorpe must "establish that the *governmental entity* was aware of the unconstitutional acts of its employees and failed to respond." *Id.* (emphasis added). Here again, absent any facts to the contrary, the Board in this matter was unaware of the actions of Mitchell, Principal Hamilton, or Superintendent Turner. Further, it seems unlikely that any amount of training would have prevented Mitchell's actions, and thus, any lack of training would not be the cause of D.T.'s injury. Summary judgment is therefore appropriate as to Thorpe's Section 1983 claim against the Board because no facts suggest that under any theory of liability, the Board can be liable solely for the actions of its employees.

### C. Section 1983 Claim Against Turner and Hamilton Individually

In Count II of her complaint, Thorpe also alleges that Principal Hamilton and Superintendent Turner are individually liable under 42 U.S.C. § 1983 for depriving D.T. of her due process right as a public school student to personal security and bodily integrity. (DE 1, DE

70). Hamilton and Turner have moved for summary judgment as to this claim as well. The issue is whether Thorpe has alleged a deprivation of D.T's constitutional rights *by these defendants individually*. *See Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002). Because the conduct alleged does not amount "to a tacit authorization of the abuse," the Court finds that Thorpe's complaint does not properly allege a constitutional deprivation by these defendants, and summary judgment on these claims is also granted in favor of the defendants. *See id.*

The Court of Appeals has held that in cases in which a plaintiff seeks to hold school administrators, here Turner and Hamilton, individually liable for a constitutional injury caused directly by someone else, here Mitchell, "supervisory liability" standards apply. *Id.* (citing *Claiborne Cnty.*, 103 F.3d at 513). Under the supervisory liability standard,

> [I]t is not enough for the plaintiff to show that the defendant supervisors were sloppy, reckless or negligent in the performance of their duties. Rather, we said, "[a] plaintiff must show that, in light of the information the defendants possessed, the teacher who engaged in sexual abuse showed a strong likelihood that he would attempt to sexually abuse other students, such that the failure to take adequate precautions amounted to deliberate indifference to the constitutional rights of students."

*Id.* (quoting *Claiborne Cnty.*, 103 F.3d at 513). The Court of Appeals has also emphasized that a supervisor's *failure to act* is not sufficient, and that "liability must be based on '*active unconstitutional behavior.*'" *Id.* at 440 (emphasis added). "In the absence of any allegation that the supervisors had 'participated, encouraged, authorized or acquiesced in' the offending conduct, we held that the supervisors had, as a matter of law, 'neither committed a constitutional violation nor violated a clearly established right.'" *Id.* (citing *Shehee v. Luttrell*, 199 F.3d 295,

300 (6th Cir. 1999)). Thus, the threshold for liability based on inaction as a supervisor under Section 1983 is extremely high.

Thorpe's argument that Hamilton and Turner should be individually liable under Section 1983 is summarized in her response to defendants' motion to dismiss. Thorpe asserts "the risk of harm to D.T. or other young female students was easily inferred from Mitchell's actions towards A.R. Turner and Hamilton's failure to properly investigate Mitchell's actions or to enact adequate procedures with regards to Student/Teacher communications through email or texting directly caused D.T.'s deprivation." (DE 70, p. 13). Such allegations against Turner and Hamilton fail as a matter of law, because they do not allege a constitutional deprivation by *these defendants*. *See Doe ex rel. Doe*, 296 F.3d at 439. While, if true, Hamilton and Turner's inaction in the investigation of the A.R. incident can be called negligent and even morally disturbing, one incident of inaction, without more, does not rise to the level of deliberate indifference to D.T.'s constitutional rights and does not amount to "active unconstitutional behavior" for purposes of a claim under Section 1983. Further, while Thorpe pleads that Hamilton and Turner "manifest[ed] deliberate indifference to Mitchell's conduct," (DE 1, p. 10) once the defendants have met their burden of pointing to a lack of evidence, Thorpe must, "go beyond the pleadings" and present some type of evidentiary material in support of her position. *Celotex*, 477 U.S. at 324. Here, nothing that Hamilton or Turner did or did not do *encouraged* Mitchell's abuse of D.T., constituted *participation* in that abuse, or *authorized*, *approved* or *knowingly* acquiesced in it. *City of Roseville*, 296 F.3d at 440 ("Nothing that these defendants did or did not do encouraged Lomnicki's abuse of Jane, constituted participation in that abuse, or authorized, approved or knowingly acquiesced in it.").

## D. Title IX Claims Against the Board

Defendants' motion for summary judgment as to the Title IX claim is denied, because Thorpe has pointed to facts in the pleadings, depositions, and exhibits to create a genuine factual issue for trial. *See Celotex Corp.*, 477 U.S. at 323. Title IX provides in relevant part "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); *Gebser*, 524 U.S. at 280. "Title IX is [] enforceable through an implied private right of action . . . [and] monetary damages are available in the implied private action." *Id.* at 281. A cause of action arising under Title IX cannot be based on respondeat superior. *Id.* at 285; *Farmer*, 2009 WL 3768906 at *7. Thorpe must show that (1) Mitchell abused D.T., (2) a school official with sufficient authority had actual notice that Mitchell posed a substantial risk of abuse to students, and (3) the school district was deliberately indifferent to that substantial risk. *Id.*; *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 363 (6th Cir. 2005) (affirming jury instructions of the district court in a Title IX case). The defendants argue 1) "There is no proof that anyone received any complaints regarding sexual harassment or abuse by Charles Mitchell prior to May 9, 2011," and 2) the Board was not deliberately indifferent to the substantial risk of Mitchel abusing students. (DE 64-1, p. 14). Since defendants do not contest prong one, that Mitchell abused D.T., the Court will assume, for purposes of this motion, that Thorpe has presented sufficient evidence on this element to avoid summary judgment.

### i. Actual Notice to Appropriate Person

Defendants' argument that "[t]here is no proof that anyone received any complaints regarding sexual harassment or abuse by Charles Mitchell towards anyone prior to May 9, 2011,"

is a factual issue that is in dispute. (DE 64-1, p. 14). First and importantly, for purposes of Title IX, only an "appropriate person" need be aware of the abuse.[1] *Gebser*, 524 U.S. at 290. The Supreme Court has defined an "appropriate person" as "an official of the recipient entity with authority to take corrective action to end the discrimination." *Id.* Therefore, for a district to be liable under Title IX, only an appropriate person, and not the Board itself, need possess actual knowledge of the abuse. Both Principal Hamilton and Superintendent Turner are "appropriate persons" under Title IX. *Farmer*, 2009 WL 3768906 at *8 (holding that a principal was an appropriate person for purposes of Title IX); K.R.S. § 160.370 ("He [the superintendent] shall have general supervision, subject to the control of the board of education, of the general conduct of the schools, the course of instruction, the discipline of pupils, and the management of business affairs. He shall be responsible for the hiring and dismissal of all personnel in the district."); K.R.S. § 160.345 ("The principal shall be the primary administrator and the instructional leader of the school, and with the assistance of the total school staff shall administer the policies established by the school council and the local board.").

Next, the Court must determine whether there is any evidence that Principal Hamilton or Superintendent Turner had "actual knowledge" that Mitchell posed a substantial risk of abusing other students for purposes of Title IX. Actual knowledge of abuse is "notice of 'facts that

---

[1] This Title IX requirement is in contrast to district liability in Thorpe's Section 1983 claim. Under Section 1983 Thorpe would need to prove that the Board itself was the wrongdoer through a custom or policy, or at least there was an individual with sufficient authority to create a policy on behalf of the district. *See Claiborne Cnty*, 103 F.3d at 508; *Farmer*, 2009 WL 3768906 at *12; *see also Griffin v. Sanders*, No. 11-CV-12289, 2013 WL 3788826, fn. 13 (E.D. Mich. 2013). Moreover, a final policymaker for purposes of Section 1983 liability is a much higher standard than a "person of authority" for purposes of Title IX. *See e.g. Farmer*, 2009 WL 3768906 at *12 ("Instead, the plaintiff's evidence relates to Principal Hill's notice of Farmer's relationship with Janie II. Although Hill is an appropriate official for Title IX notice purposes, it does not follow that he has final policymaking authority for purposes of § 1983 liability, or that his inaction can subject the school district to liability under § 1983.").

indicate the likelihood of discrimination.'"[2] *Evans v. Bd. of Ed. Southwestern City Sch. Dist.*, No. 2:08-CV-794, 2010 WL 2889100 at *8 (S.D. Ohio July 20, 2010) (quoting *Massey v. Akron City Bd. of Ed.*, 82 F. Supp. 2d 735, 744 (N.D. Ohio 2000)). This does not require proof of "actionable sexual harassment." *Id.* Here, Thorpe has provided enough facts to create a jury question as to whether Hamilton and Turner had actual notice of certain facts indicating a likelihood of discrimination.

Thorpe submits the following evidence to show that Hamilton and Turner knew that Mitchell presented a substantial risk of abusing female students:

- In May 2010, Mitchell and A.R. exchanged 168 text messages in the course of an eight hour period. (DE 57-2). Many of those text messages were exchanged "all the way through the night." (DE 68, p. 7).

- During the text messages between A.R. and Mitchell in or about May 2010, Mitchell texted A.R. that A.R.'s friend should break up with her boyfriend because "she was too pretty and too good for him." (DE 57-2).

- A.R's father and mother spoke with Principal Hamilton. A.R.'s father was "pissed." A.R.'s father testified that Hamilton said something to the effect of, "It's sick. You know what he's got on his mind." (DE 68, p. 9–10).

- A.R.'s father met with Superintendent Turner. A.R.'s father testified that Turner said something to the effect of "He's a sick- he's a sick pervert. You know what he's got on his mind. I'll make sure, Rick, [A.R.'s father] I'll take care of this. I'll put a stop to this right now." (DE 68, p. 11).

---

[2] Notably, this is also a lower standard than is required for individual liability under Section 1983. To be liable under Section 1983, a supervisor of the wrongdoer must take affirmative action, but under Title IX failing to act under circumstances that show a likelihood of future discrimination is enough.

- A.R.'s father told Turner, "If you don't [put a stop to it] Arch [Turner], he's [Mitchell] going to end up raping somebody, if he ain't already . . . it's untelling how many more kids over there he's probably done this way."  (DE 68, p.11).

- In regard to the A.R. texting incident Turner was asked, "Did you think it could have been something sexual?," Turner responded, "I thought it could have been."  (DE 63, p. 125).

- Secretary McKnight's notes indicate that Mitchell also texted, "T., B., E., and T.," all eighth grade girls.  (DE 60, p. 14).

- At a meeting in May 2010, after the A.R. incident, Mitchell testified that Principal Hamilton and Assistant Superintendent Napier said the school needed to be a "safe place" and to stop texting because it could lead to "getting fired, jail time, ruining everything." (DE 62, p. 39).

- In Mitchell's written statement, dated May 17, 2010, in response to the A.R. incident, Mitchell stated, "I would never dream of doing anything like they are suggesting."  (DE 57-2).

- As a result of the A.R. incident Turner and Hamilton suspended Mitchell for ten days without pay, but did rehire Mitchell for the next school year.  (DE 70-2).

- Hamilton, at the direction of Turner, attempted, unsuccessfully, for several months after the A.R. incident, to obtain records and transcripts to verify that that A.R. and Mitchell did not discuss anything inappropriate.  (DE 70-3).

- A statement from a female student (potentially A.R.) dated May 17, 2010, states "I have received text messages from Mr. Mitchell, but nothing inappropriate is ever said or been

texted.  I just tell him about things girls say about him that he needs to know.  Not many texts are sent, usually just less than 20 and in the evening."  (DE 57-2).

- When the Facebook messages were discovered in May 2011 between Mitchell and D.T., Mitchell testified that Superintendent Turner said, "That it was a huge mess, couldn't believe I've [Mitchell] done this again . . . I [Mitchell] never did get those transcripts from 2010 for them."  (DE 62, p.188).

Based on these facts, Thorpe has presented enough evidence for a reasonable jury to find that Turner and Hamilton had actual knowledge of a substantial risk that Mitchell would abuse female students.

## ii. Deliberate Indifference

A federal assistance recipient, here the Board, is only labile where the recipient "itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to known acts of harassment."[3]  *Vance*, 231 F.3d at 260.  "[T]he deliberate indifference must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it." *Patterson v. Hudson Area Sch.*, 551 F.3d 438, 446 (6th Cir. 2009).  "A plaintiff may demonstrate defendant's deliberate indifference to discrimination 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Vance*, 231 F.3d at 260.  (quoting *Davis Next Friend LaShonda D. v. Monroe Cnty Bd. of Educ.*, 526 U.S. 629, 648 (1999)).  While a school district is not required to respond in a particular manner, "where a school district has actual knowledge that its efforts to remediate are ineffective . . . such district has failed to act reasonably in light of the known circumstances."  *Id.* at 261.  Thus, it is

---

[3] Deliberate indifference under Title IX does not require that an administrator take an affirmative action to be liable, as is the case for supervisor liability in Section 1983 claims.

incorrect to say that as long as Hamilton and Turner did *something* in response to harassment allegations, they were not deliberately indifferent. Were that true, "a school district could satisfy its obligation where a student has been raped by merely investigating and absolutely nothing more." *Id.* at 260.

A school district can only be liable to remedy harassment that it *knew* was occurring. *See Patterson*, 551 F.3d at 452. However, taking Thorpe's allegations as true, a reasonable jury could conclude that Hamilton and Turner knew that Mitchell posed a substantial risk of harassing other girls in the future, and based on that knowledge, their actions– suspension of Mitchell for ten days without pay and a failed attempt to investigate the situation– were clearly unreasonable. Particularly considering the gravity of the known circumstances, for example Turner's admission that he thought the A.R. incident could have involved something sexual, a jury could find Turner and Hamilton's remedial actions were clearly unreasonable. (DE 63, p. 125). Furthermore, Mitchell was non-compliant with Turner and Hamilton's attempts to investigate the A.R. incident and never produced the requested text messaging transcript of his conversations with A.R. (DE 70-3). "[W]here a school district has actual knowledge that its efforts to remediate are ineffective . . . such district has failed to act reasonably in light of the known circumstances." *Vance*, 231 F.3d at 261. Viewing the facts in a light most favorable to Thorpe, there is a genuine issue of material fact as to whether Turner and Hamilton's actions were clearly unreasonable in light of the known circumstances and therefore were acting with deliberately indifference.

### E. State Law Claims Against Turner and Hamilton

Summary judgment is appropriate in favor of Turner and Hamilton with regard to both state law claims alleged, intentional infliction of emotional distress, and "violations of Kentucky Constitution and Revised Statutes." (DE 1, p. 13). Once the moving party has pointed to a lack

of evidence, Rule of Civil Procedure 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. Here, Thorpe has failed to beyond the pleadings and point to any part of the record that would indicate that Hamilton or Turner intentionally sought to inflict extreme emotional distress on D.T. While Turner and Hamilton's actions may have been careless and arguably even deliberately indifferent for purposes of Title IX, they were not acting with intent to cause harm to D.T. In fact, there is no evidence to suggest that Turner or Hamilton had any knowledge that Mitchell was harming D.T. at all. Thus, the intentional infliction of emotional distress claim against Turner and Hamilton fails as a matter of law. Thorpe also fails to produce any evidence to suggest that Turner and Hamilton violated D.T.'s due process rights or rights against illegal seizure, because Turner and Hamilton cannot be vicariously liable for Mitchell's conduct. Thorpe has also provided no legal support for a cause of action arising under the Kentucky Constitution. Thus, in the absence of facts and law to support these claims, Thorpe cannot rest on her pleadings.

### III. CONCLUSION

Accordingly, for the above stated reasons, the Court **HEREBY ORDERS** as follows:

1. Defendants' motion for summary judgment (DE 64) is **GRANTED** as to:

    a. Thorpe's claim against the Board arising under Section 1983;

    b. Thorpe's claim against Turner and Hamilton arising under Section 1983;

    c. Thorpe's state law claims against Turner and Hamilton;

2. Defendants' motion for summary judgment (DE 64) is **DENIED** s to Thorpe's Title IX claim; and

3. The only remaining claims in this matter are as follows: Thorpe's Title IX claim against the Board, Thorpe's Section 1983 claim against Mitchell, and Thorpe's state law claims against Mitchell.

Dated this 20th day of March, 2014.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY